We'll begin this morning with case number one, case number 18-1742, Christopher Coleman v. City of Peoria. First, we'll hear from Ms. Levy. Good morning, Your Honor. May it please the Court. This morning, I'd like to focus on plaintiff's fabrication of evidence claim. Both parties agreed that the entirety of the statement from 12-year-old Anthony Brooks regarding the Miller home invasion originated from Detective Rabe. It was 100% spoon-fed and spit back out. Brooks' deposition testimony explains that Detective Rabe told him everything to say, and the defendants, their statement of undisputed material facts contends Brooks agreed to tell the police's story. Their FLE brief also says Brooks agreed to tell the story given to him by the police. All of the names and all of the details and all of the facts in the statement that 12-year-old Anthony Brooks gave originated from Detective Rabe, and that is fabrication of evidence. When Mr. Brooks comes back, is it a month later with his mother? Yes. And recants, is there any aspect of his statement that he says was truthful, or does he recant the entire statement? He recants the statement, and he contends in his deposition that he goes line by line through it. Every single thing that he said in the statement with Detective Rabe came from Detective Rabe, and he just agreed to it. Detective Rabe showed him pictures and said, these are the guys who did it. This is the ringleader, Chris Coleman. He points, and Brooks shows how Detective Rabe points out each person. He's not shown a ton of pictures. He's shown just the number of offenders. And Brooks' deposition testimony goes line by line, and he says every single thing originated from Detective Rabe. Quote, Detective Rabe, he told me to say all of that. So his testimony is that 100% of this came from Detective Rabe, and the defendants have conceded that. They conceded it in their statement of the undisputed material facts, and they conceded it in their appellee brief. So you're left with a statement that came 100% from the detective, and that's fabrication of evidence before we even get to the question of what Detective Rabe knew and when about Chris Coleman's arrest. If you look at the three seminal cases that we discuss in the briefs about fabrication of evidence, Whitlock, Petty, and Avery, it illustrates this, because we begin with Whitlock, where this court says that an officer manufactures false evidence when it's used to deprive the defendant of liberty in some ways, that that violates due process. And then this court curves out an exception in Petty, and the Petty exception is that when an officer coerces a reluctant witness to spill the beans to say what he knows, that's coercion. That's not fabrication, but that's coercion. That's twisting his arm to tell what he knows. And then we're finally in Avery, reminds us, but when the officer manufactures the statement, when the officer tells the witness what it is that he needs to say, that's fabrication of evidence. And this case is on all fours with Avery. We have both parties agreeing, and Brooks's very clear deposition testimony, that 100% of this statement originated with Detective Rabe. This is on all fours with Avery, and this doesn't fit into that Petty exception. This is not a case where a reluctant witness was coerced into telling what he knew, because there was absolutely nothing original that came from little Anthony Coleman. So on these facts alone, I will turn to the question of what Detective Rabe knew when, but on these facts alone, a jury should get to decide whether or not Detective Rabe was hoodwinked by a 12-year-old who had no independent knowledge of the case. I will, like I said, address what Detective Rabe knew and when, but I think even before you get to that question, we have a clear case on all fours with Avery and with Hurt of fabrication of evidence. But make no mistake about it, a jury could certainly find that Detective Rabe knew that Mr. Coleman was in PPD custody during the Miller home invasion, and that his participation was therefore impossible. The argument, the response argument is that that's speculation. What evidence do you have in the record that Rabe knew Coleman was arrested before 310 AM? Okay, so Detective Rabe didn't testify on the fact, there's no direct evidence either way. Rabe doesn't say I knew it, he doesn't say I didn't know it, and he passed away before he was ever asked. There's no officer who says we intentionally kept it from Detective Rabe, he wouldn't have known it. So you're in the land of inference. So the question is whether or not it's reasonable for a jury to infer that of course he would have known that. And I'd like to go through the sequence of events to show you how reasonable our inference is. First of all, no one, not even the arresting officer disagrees. Officer Theobald arrived and found Mr. Coleman in the apartment between 2.45 and 3 o'clock AM. That's the only evidence out there that says it was between 2.45 and 3. He found him where? In his girlfriend's apartment. The girlfriend, the roommate, and Mr. Coleman all testified that that's what time Officer Theobald arrived. Theobald doesn't deny that that was the time, 2.45 to 3 o'clock in the apartment. And then everybody, the plaintiff, the defendant, and the district court agrees that the Miller home invasion occurred between 2.40 AM and 3.10 AM. So this Officer Theobald showed up right smack in the middle of the Miller home invasion, towards the beginning, in the middle of the home. Did Officer Rabe have any supervisory authority over the other break-ins, the investigation of the other break-ins that happened that night? So he was the lead detective and he... A lead detective on what? He was the lead detective on the Miller home invasion. On the Miller home invasion. But he, on his arrest report on the Miller home invasion, he writes in, as the related cases, he lists the Buckley home invasion. And that arrest report, though, would have been written sometime after the immediate, after the time sequence we're looking at? When was that written? It was written at 1... I'm sorry, at 1.30 PM. So the interrogation of Anthony Brooks happens at or after 4 o'clock. So 3.10, so at 2.45, Chris Coleman is found in the apartment. At 3.10 AM, the home invasion concludes. Detective Rabe goes to the police station. And lo and behold, his suspect happens to already be there. Mr. Coleman is there. And at 1.30, he arrests Mr. Coleman on the Miller home invasion. And on that arrest report, he lists related cases and he puts the Buckley home invasion case number down. And that report was produced at 1.30 AM? 1.30 PM. PM. So that's in the afternoon. So all this stuff happens in the early morning. And then before the lineup happens and before Anthony Brooks is interrogated, Detective Rabe arrests Mr. Coleman for the offense. My point is, in the early morning hours, what did Officer Rabe know about those other break-ins? Excellent. So the testimony is that it was a shared police channel, so that they were hearing about both. Both were going on at the same time. There's testimony that there was discussion about Stiebald going to the apartment to get Chris Coleman as a suspect on the Buckley home invasion. And at the same time that Detective Rabe shows up at the Miller home invasion. So everybody was viewing these two offenses as connected. The officers testified that they were talking amongst themselves. The arrest reports cross-referenced one another. Wouldn't it be a little bit more accurate to say they were investigating whether they were connected? Well, if you take a look at the statement of facts that the appellees offer, their whole theory of the case was that these were a series of home invasions that the police were assuming were connected. They were investigating a number of home invasions that they believed to be connected, and they were running with that theory. It seems to me, for your theory of the case, you really need to show a strong inference that Rabe actually knew about the earlier robbery or home invasion, and he actually knew of this man's involvement in it. Well, we know he definitely knew about the earlier robbery or home invasion. Is that the Buckley? Because he listed on his police report before he speaks to Anthony Brooks. Is the earlier one the Buckley? The Buckley, yes. OK. So we know that Detective Rabe is absolutely aware of the Buckley home invasion because he writes about it in the police report before he interviews Anthony Brooks. So there's no question that he was aware of the two home invasions. And then when his suspect, when he goes looking, when he wants to put Chris Coleman in a lineup and Chris Coleman is already in custody, there's absolutely no reason when he thinks these two are connected that he wouldn't ask, where did you get him? When did you get him? Did he have the proceeds? Did he have a gun? Was he running from the Miller home invasion? Detective Rabe was at the Miller home invasion until 3-10. He was there when suspects were there and when they were fleeing. And then he returns to the PPD. He returns to the police department, and Chris Coleman's already there. And, of course, the logical inference is he's going to ask, how did he get here? When did we get him? Did he have anything that could help prove my case and the Miller case? That's what an investigator would do. And I would challenge opposing counsel. They have never given any basis for the opposing inference for why the lean detective would not ask, how did you arrest him? When did you arrest him? Where did you arrest him? What went on? They have to come up with some basis for their opposing inference because our inference makes sense. That's how a case would be investigated. And not only do they have to come up with an opposing inference, they have to come up with one that's so compelling that you wouldn't give ours any credit, that you wouldn't think a reasonable jury could find that when an officer was investigating this case, of course he's going to and when these cases are being treated as related by that investigator, that he wouldn't ask about the circumstances of the arrest. Are you claiming that he wasn't involved in either? Correct. Mr. Coleman was not involved in either of them. And we know for sure on the Miller one because he was in custody at that time and he has witnesses that he was home in bed asleep from 10.30 on. And the Buckley home invasion never came to anything with him either. Who was it that saw them before the lineup? Was it Tequila? I'm sorry? Tequila was it that said those are the dudes that were in the house? Yes, so the officers what they do is they have Nixon who was identified at the scene as a perpetrator by Tequila. And they parade Mr. Coleman handcuffed with Nixon. And they say we've got the suspects who did it and they parade the two of them and she says there go them guys who did it. Or something to that effect. Let's talk about that identification for a few minutes. The briefs are very difficult to read on this very, very frankly. I gather there was evidence was submitted at trial. The jury did hear about the so-called show up or the encounter and the jury did hear about the photo array. Am I correct? Yes. And you are objecting to that evidence being admitted. We are objecting. We are saying that when you get to, well it's two-fold. There's the Brady problem that the jury was not informed that when they did the lineup. I don't want to talk about that right now. Suggestive ID. Correct. And our problem is that this was an overly suggestive ID. That by telling her we have the suspects, by telling her to identify the person who you saw in the photographs. By telling, they gave her so much information that this was not in a way a meaningful identification. But then there was also an in-court identification. Correct? Correct. And there was no objection to that. To the in-court identification. Am I correct? Correct. Why and isn't that sufficient? You didn't object to the in-court ID. The lead up to that identification was so troubling and so tainted it that it is problematic. In the motion in limine that you filed, you objected to the suggestive eye encounter, to the photo ID. You did not ask the judge to exclude an in-court identification. And then you didn't object at trial when there was an in-court identification. I recognize that this is not as strong as some of the other claims, which is why I was hoping to focus this morning on the fabrication, which I think is where the real strength lies. And I think that once you recognize. But it seems to me you've got a valid in-court ID. And not an awful lot that you can encounter that. And I would say that it's tainted by what happened previously. But you should have argued that in the trial court. And again, I would say that it's tainted. But I would like to return, if I may, to the focus on the fabrication claims. And I guess your argument on the fabrication is, in effect, you've got to really show that this officer put words in this 12-year-old's mouth. Am I right? That's basically what you're arguing. This is Avery. Your Honor, with all respect, this is Avery. If you look at Brooks's deposition testimony, he goes through it line by line. He says he showed pictures. He kept pointing to Chris, talking about how he was the ringleader. He kept telling me he was the ringleader. He told me, I'd never see my family again. And he talks about all of the threats. And he goes through line by line and says, he showed me the photographs. And he kept putting his fingers on it. I was the lookout. He told me I was looking. Who gave you this information? It was Detective Rape. He goes through and says every single thing that he said originated with Detective Rape. That's fabrication of evidence. That's no different. You're into your rebuttal. Would you like to reserve? Yes, I would like to reserve time for rebuttal. Thank you. Thank you. We'll now hear from Ms. Ranum. Good morning, Your Honors. May it please the Court. My name is Laura Ranum, and I represent the defendants in this matter. Plaintiff's counsel just spent a lot of time talking about what he needs to show to support his fabrication claim. Plaintiff's counsel at one point said that it doesn't matter what Rape knew. But that is exactly what matters. It is well established in this circuit that to support a fabrication claim, Detective Rape had to take a knowingly false statement. That's petty. That's avery. This Court has been consistent on that. So when Detective Rape takes Anthony Brooks' statement, he has already heard from Tequila Miller that Anthony Brooks and Christopher Coleman are at the home invasion together. Detective Rape has no reason to believe that the statement that he's taking from Anthony Brooks is false. And the way that Plaintiff tries to get around this is by seeking this double inference from this Court that Plaintiff could not have committed the crime because he was already in custody. And the second inference is that Detective Rape somehow learned that and decided to frame Christopher Coleman, a man he had never met, for some unknown reason. And this all happened within a couple hours after the crime. Now I'd like to talk to this Court a little bit about what is a permissible inference to defeat summary judgment. It's well established in this circuit that Plaintiff has to be able to point to specific facts, evidence in the record, that can reasonably support an inference that a jury could find in his favor. It can't be based on allegations. It can't be based on speculation or hints or what-ifs. And that's what we have here. And Plaintiff concedes it. Plaintiff says in his reply brief on page 3, when he's discussing whether or not he was in custody at the time of this crime, he concedes his timeline isn't impossible. But that's not Defendant's burden on summary judgment. On summary judgment, Defendant doesn't have to come to this Court and say, we can prove every theory and hypothesis that Plaintiff comes up with is impossible. Plaintiff has to point to facts in the record. And Plaintiff has tried to exploit the untimely death of Detective Rape by saying that because he couldn't specifically deny that he knew Plaintiff was in custody, that somehow that entitles him to a favorable inference. But that's not the case, and that's not supported by the law. And none of the officers in this case ever testified that Theobald talked to anyone about the time of arrest or that there was anything exonerating about the time of arrest. And the most dispositive testimony on this point is that Officer Theobald specifically testified in his deposition that he is certain that on the night of this crime, he heard the Miller home invasion transmitted over the radio sometime before he went to the Warner homes to investigate the Crime Stopper tip. Plaintiff tries to spin that in his reply brief that he tries to put it closer together. Like, well, he could have been walking into the apartment at the time he heard it, but Officer Theobald's deposition is entirely clear. He reiterated it several times. He is certain about the sequence of events that night. He heard the transmission of the Miller home invasion, and then sometime later he went to the Warner homes to investigate the Crime Stopper tip. Was that about carrying a stereo, the Crime Stopper tip? Yes, Your Honor. There was a Crime Stopper tip that came through. Where was the Buckley invasion? The Buckley home invasion was at a place called the Village Green Apartments. And how far are these apart? I apologize. How far apart is... The Miller and the Buckley geographically. So, Village Green... I know it's in our briefs, and as I stand here, I can't remember how far Village Green is from Miller. I know that Miller is four blocks from the Warner homes where Mr. Coleman was found. Now, Officer Theobald talks about the sequence of events in his deposition, and he is certain that he heard this radio transmission beforehand, and that actually sticks out in his mind to this day, because he remembers that he wanted to go be able to assist on that home invasion, but he couldn't because he was already tied up on another matter. But even still, there's something else about Officer Theobald that I'd like to address with this Court, and that's that Officer Theobald... We talk a lot in our brief about the fact that the plaintiff's story is very different now from the story that he told for 24 years. And so for 24 years, throughout his criminal trial, throughout his Certificate of Innocence proceedings, and even when he filed his complaint in this case, his story was always, I was in bed with my girlfriend at a friend's house during the time of the home invasion. And that was true even after discovery closed in the case. He filed a Second Amendment complaint, and he again said, I was with my girlfriend in bed at a friend's house. It wasn't until summary judgment when he realized he needed something to conjure up an inference that Rabe somehow knew he was innocent, that he started saying, I was in custody at the time of this home invasion. So now we've come so far afield by the time we get to the appeal on this case that Officer Theobald is the star of this conspiracy. Detective Rabe, he can't execute this conspiracy without Officer Theobald. He needs Officer Theobald to fabricate a crime sabotage, go to pick up Mr. Coleman, decide he's going to omit the time of arrest from the police report because he somehow knows it's exonerating, and Rabe wants to frame him. And then he goes back to talk to Detective Hines, who's the investigator on the Buckley home invasion, and he lies to him. And he says, I heard this other home invasion come over the radio, and I believe these two home invasions are related. I thought you should know that. Without those three acts, Rabe can't execute his alleged conspiracy, and yet Officer Theobald has never been named as a defendant in this case. So I think that's very important for the court to know, just to see how far afield this story has come from where it started. Was Coleman supposedly involved in the Buckley invasion? Yes. Ms. Buckley did identify Mr. Coleman in a live lineup on the same day that Tukwila Miller identified Mr. Coleman. Okay, so she saw him or whatever? Ms. Buckley identified him. In that invasion? In the Buckley home invasion, yes. Is that where the stereo came from? Yes. So the Crimestopper tip came through and said that it saw Mr. Coleman going into an apartment at the Warner Homes, carrying a stolen stereo. And obviously it was known that there was a stereo that was taken from the Buckley home invasion. So those were some of the details that were provided. Did you say that Buckley or whoever it was saw him or identified him at the Buckley robbery? Is that what you're saying? Yolanda Buckley was the victim in that case, and she did come in on August 22nd, the same day that Tukwila Miller viewed the live lineup, and she viewed the same live lineup and identified Mr. Coleman. Okay, so the only question is when they say can he be two places at once, well, probably not. But it doesn't seem there's any question about the Buckley invasion. Well, so Mr. Coleman was never convicted on the Buckley home invasion. I just want to be candid with the court. The case that preceded was the Miller home invasion. But, yes, Ms. Buckley identified Mr. Coleman. Okay. Thank you. So anyways, as I was saying, Your Honors, there's two steps in this inference, and we believe that this court can't even find there's no evidence in the record to support even the first step of the inference. It is clearly possible that Mr. Coleman committed this crime. But even if this court were to find there's a question of fact and a jury could infer that he was in custody at the time of the crime, that's immaterial unless Detective Rabe knows about it. And it's not enough that Detective Rabe knows about it. Detective Rabe has to learn it before he sits down with Anthony Brooks at 4 o'clock on August 22nd. There is nothing in the record to support an inference that Detective Rabe ever went in the time of arrest, let alone in those first hours after the crime. The only evidence that plaintiff has pointed to is some general deposition testimony that Detective Rabe spoke with Officer Gaffney. Officer Gaffney was the responding officer on the Miller home invasion. So, of course, your lead detective shows up at the home invasion. He's going to talk to the patrol officers on the scene. The other evidence that plaintiff points to is that Officer Theobald and Detective Hines spoke. Detective Hines was lead investigator on the Buckley home invasion. And Your Honor has asked a question to plaintiff about were these rapes subordinates. And it's really important to understand. I really want to emphasize this to the court. Yes, Peoria Police Department believed that there was a series of related home invasions going on, but they were still separate crimes being investigated by separate detectives. These were not Detective Rabe's subordinates. He was in charge of one of them. Detective Hines was in charge of the Buckley home invasion. Now, Officer Theobald didn't even testify that he ever told Detective Hines the time of arrest. There's no testimony anywhere that he ever communicated the time of arrest to anyone. So without this inference, plaintiff simply has a coercion claim. And there is no way to support a fabrication claim under the case law of this circuit based on a coerced witness. If plaintiff cannot present this court with evidence that Rabe took a knowingly false statement from Anthony Brooks, and they cannot, then they cannot support a fabrication claim. Plaintiff has raised some brand new arguments on appeal, and some of them were discussed today. And I'm happy to address any of those if the court has any questions. But we do want to—we argued waiver in our brief. We do believe they've been waived. They are brand new arguments. Plaintiff has attached new exhibits to their appendix of things that weren't even in the record below. We believe those arguments are waived. They are also without merit. I'm happy to address them. They do want to spend some time also talking about the identification claim. Because on one hand, you have plaintiff's story, which has morphed, become a moving target. I believe, by my count, we're on the sixth iteration of plaintiff's story. And on the other hand, you have the victim, Tequila Miller. Her story has never changed. Her story is that she was 17 years old. She was a victim of this home invasion. Her family was beaten. Her twin sister was sexually assaulted. And within hours of the crime, she goes to the Peoria Police Department, and she tells Detective Rabe, I saw the faces of several of the attackers, and I recognized them from when I lived in the Warner homes. Within 14 hours of the crime, she identifies Christopher Coleman three separate times as one of the perpetrators of the home invasion. She later testifies that she did so because she saw his face for approximately three minutes during the crime, and she recognized him because she knew him. And she had known him for years before this crime. They had grown up together in the Warner homes. Is there any testimony in the record or evidence in the record with regard to why the mask of that individual was off for that period of time? What Tequila testifies to is that the mask was removed, and she was able to see his whole face. For approximately three minutes. For approximately three minutes. And she says a good three minutes. Correct. There isn't necessarily testimony about why the mask was removed, and actually it brings up a good point, which is that the biggest factors that we discuss in our brief, that's an admissibility standard. And to the extent that plaintiff wanted to argue in his criminal trial that she didn't see what she thought she saw, that was all for the jury to hear in the criminal trial. And to the extent that Judge Shadid, his lawyer at the time, believed that there were vulnerabilities if she had seen what she saw, that was all presented at the criminal trial. And that was the point that there was testimony that this Coleman was in the mother's presence during the actual break-in. Correct, Your Honor. So Bertha Miller was Tequila Miller's mother. She also identified him at the trial. Her identification was based on his walk and his voice. And what Judge Shadid argued in closing argument was that Tequila and Bertha's stories contradicted each other, and he tried to raise some doubt to the jury about whether Tequila had seen what she believed she did because Tequila and Bertha were in different rooms. And your point is that's not for us to worry about. That was decided at trial. Absolutely, Your Honor. For the biggest factors, we have to look at what is the victim saying. So the victim here said, I knew him, I saw his face, I recognized him. It would be preposterous and completely unsupported by any precedent to say that a victim under those circumstances shouldn't be allowed to testify at the trial about her identification. So there was no overreaching by a prosecutor to introduce that and let the jury decide. Correct, Your Honor. And this court just a couple weeks ago in United States v. Books had a similar issue. In that case, it was a bank robbery. And the robber came in, he was wearing a mask. He never removed his mask in that case. And two of the bank tellers said that they could identify him based on his walk, his voice, and his mannerisms. And it was because he had been in the bank before as a customer. And there was a challenge to the identification brought because there was an allegation that the detective actually told the two tellers that the criminal defendant had confessed and that that could be suggestive. And this court emphasized in saying that the identifications were sufficiently reliable, this court emphasized the prior familiarity that the tellers had with the criminal defendant and the fact that they were unwavering in their confidence at the trial. And that's exactly what we have here. Tequila Miller knew Mr. Coleman. She had known him for years. She said she saw his face. And she never wavered on that at trial. She has never wavered on that. Counsel, when it's convenient, maybe you could give us a sound bite as to your view of the waiver issue. You mentioned it before. We've got a lot of material on these six cases. Why do you think that some of these claims were waived? So on the fabrication claim, a plaintiff has raised, I believe it's four new arguments. They've raised this idea that counsel emphasized in her opening argument about the fact that the details of the confession were spoon-fed, which frankly doesn't support a fabrication claim anyways, but it is a new argument. They've raised this argument about the arrest card, which is a brand-new exhibit attached to their appendix for the first time. It wasn't argued below. The document was never addressed below. And they've also raised basically some sort of idea that this court can infer from the Monell evidence the plaintiff believes he has, that somehow that would support the idea that there was a constitutional violation here. I don't fully understand the argument, but all three arguments are completely brand-new factual theories to support the fabrication claim, and plaintiff tries to say in his reply, well, we can offer additional proofs because we argued below that the statement was knowingly false when it was taken. I don't read the case law that way at all, and I would direct this court to the Allen case, which we cite in our brief. And the Allen case specifically talks about the fact that you can't raise new factual theories on appeal that weren't hashed out before the district court, particularly when you're dealing with a new exhibit. Defendants and everyone had an opportunity to respond to that exhibit in the district court and potentially bring in new evidence or new testimony that we would have to respond to that exhibit. Thank you. So going back to the identification claim, the other thing I really want to emphasize about this is not only was Tequila Miller's identification sufficiently reliable to be admitted, but at this stage of the game, we're no longer just dealing with an admissibility issue. We're dealing with a 1983 action, and that means that defendant's conduct... In Alexander, this court recognized that there's a third hurdle. Defendant's conduct had to somehow taint the plaintiff's criminal trial, and plaintiff cannot overcome that hurdle in this case. Judge Shadid filed a motion to suppress. Judge Shadid extensively cross-examined Tequila Miller. To Tequila Miller, her identification of plaintiff was put under a microscope in that criminal trial. She was extensively cross-examined. She was impeached with her prior testimony, and Judge Shadid spent majority of his closing argument... You keep referring to him as Judge Shadid. He's an attorney then, right? He was an attorney then. Attorney Shadid, in his closing argument, spent majority of his time addressing, harping on what he believed were his perceived weaknesses of Tequila's identification. And from there, it goes to a criminal jury. That's due process. There is one last issue I'd like to address with the court, and that's the materiality issue under the Brady claim. Now, the district court found that because Tequila Miller's identification was sufficiently reliable, that under these circumstances, that photograph is not material for Brady purposes. Plaintiff has tried to conflate the two, or say that the district court conflated the two analyses, but that is not correct. The district court simply was acknowledging that, as applied here, the live lineup was the third identification of the day. Tequila Miller had already identified Mr. Coleman twice, and her identifications were reliable. Nothing about that photograph creates a question of fact about whether there was a reasonable probability that that photograph would have resulted in an acquittal. I do want to address one other point that counsel made in her opening, which is that counsel has said that Mr. Coleman was paraded past Ms. Miller. There is absolutely nothing in the record to support that. Tequila Miller testified at the motion to suppress that she's the only person that testified about this, and what she says happened is that she turned around, she saw Mr. Coleman, she immediately spontaneously identifies him, and that it was her perception that the officer didn't want her to see Mr. Coleman, quickly turned her around and walked her in the opposite direction. Was this when she made the comment those were the dudes that were in the house? Yes, Your Honor. Yes, and it happened literally roughly two to three hours after this crime happened. She spontaneously identifies him at the department, and plaintiff has no evidence to show that that was in any way orchestrated by law enforcement. And because it wasn't orchestrated by law enforcement, it is outside of the realm of the due process inquiry under Perry v. New Hampshire. It was an inadvertent showing that resulted in a spontaneous identification, and it shows just how reliable Tequila Miller is. She has never not identified plaintiff. Every single time she encountered plaintiff, she identified him as a perpetrator. And for all the reasons we've discussed today, and all the reasons that we've addressed in our briefs, we ask that this court affirm the district court. Thank you, Your Honor. Thank you. Rebuttal, Ms. Levy. Thank you. Before I jump in, I'd like to remind this court, Mr. Coleman has received his Certificate of Innocence. He didn't commit this offense. Tequila's identification was incorrect. And for the purposes of this appeal, certainly those facts need to be credited. He's an innocent man. He didn't commit this offense, and there was an error made in the identification. Of course. We do have to look at this at the time the defendant officers acted. I understand that. I just didn't want that to get lost in the comments that were being made, to recognize that this was an erroneous identification, and also to point out that the Buckley charges against Mr. Coleman were dropped. And I'd like to at least start from that premise of understanding that this is an innocent man who was wrongfully convicted, who spent almost 20 years in jail. And I just want that to be recognized at the outset so that the evidence is credited properly and we view it through that proper prism. What's your response, then, to the Apley argument with regard to the shifting defense? Assuming you agree with your premise? I was just going to go there next because I think that's a really important one, and I'm glad she brought it up. I've thought about that issue a lot. I think the answer is that the defendants, what they did was so insidious. I don't think defense counsel realized the timing error during the criminal trial. Certainly if he had, it would have been raised. It's not like Mr. Coleman would have kept this in his pocket to save for a potential lawsuit down the line. When Mr. Coleman was going to be defended, what he could tell his defense counsel was, I was in bed asleep that whole night from 10.30 on, and that's the defense he put on. He said it, his girlfriend said it, the girlfriend's roommate said it. He was in the apartment from 10.30, he was asleep. Now, Mr. Coleman wasn't a participant in the Miller home invasion, so he didn't know that the arrest happens right smack in the middle of it. And what do you have? You have Theobald's police report doesn't alert counsel to the fact of what time the arrest happens, and you have defendant Ford says that he saw an arrest report that does say 3.10, and that report disappeared. It was never produced in the criminal case. It was never produced in the civil case. So I think that defense counsel went into this criminal case, and he genuinely did not realize that the arrest happened right smack in the middle of the Miller home invasion. Certainly if he had realized that, he would have raised that as a defense, and that's part of the tragedy here, and we can't lose sight of that tragedy. Mr. Coleman has to bring this up. That's what came out. That's how civil cases get litigated. During the course of civil discovery, this unfolds. We realize it. It absolutely was raised below, and if you look at the summary judgment decision, it's very clear. It says that we raise the issue that the arrest occurred, that Detective Rabe knew that Chris Coleman was in custody at the time of the arrest. But as for the evidence that unfolds, that's how civil litigation happens. It's not always necessarily clear at the time of the complaint, but it became clear by the time of summary judgment. They didn't argue waiver in summary judgment. They didn't argue that it was new or that it wasn't raised in the criminal case during summary judgment. If they had complained that it wasn't in the complaint, we could have amended. They didn't. But I think the reason it wasn't raised then was because their deceptions were so insidious, I don't think defense counsel realized it. Because certainly if he had, he would have raised it. That was the best defense, and Mr. Coleman would not have had to wait nearly two decades to get his certificate of innocence in order to be freed. Moving on to some of the other points that counsel made, she says that we're taking the position that it doesn't matter what Rabe knew. And that is absolutely incorrect. Of course it matters. It absolutely matters, but this case is on all fours with Avery. And what Avery tells you is that when the detective feeds 100% of the statement, tells the person what to say, that that is fabrication, that that's proof of fabrication, that that act of spoon-feeding is the proof that the detective knew, from which a jury could infer the detective knew the statement was false. There is a very narrow exception that's carved out in Petty for a coercion-only case. And in Petty, there was no accusation that the detective told the witness what to say. In Avery and in Hurt and in the cases where the detective tells the witness, here's what you have to say, those are fabrication cases. This is not a new argument. We've been citing Avery all along, and that alone is grounds for the fabrication claim. And once you get there, the other claims, I think, fall with it, go in line with that. I'm sorry. I also want to just briefly address the Theobald sequencing issue. I believe you're at your time. All right. If you want to finish up very briefly. It's in the briefs. I'll rely on the briefs for the remainder here. This case is on all fours with Avery. We've met our burden. Mr. Coleman deserves a day in court. Thank you. Thank you, Ms. Levy. The case will be taken under advisement. Thank you to both counsel.